KEN MILLER SUPPLY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent KENNETH R. MILLER AND LOIS N. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ken Miller Supply, Inc. v. Commissioner
Docket Nos. 7994-76, 7995-76.
United States Tax Court
T.C. Memo 1978-228; 1978 Tax Ct. Memo LEXIS 287; 37 T.C.M. (CCH) 974; T.C.M. (RIA) 78228; June 20, 1978, Filed John A. Dunkel and Michael R. Becker, for the petitioners. Donald W. Mosser, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: Respondent has determined the following deficiencies in petitioners' Federal income taxes: Petitioner
Year
Deficiency
Kenneth R. and Lois N.
1972
$ 898.14
Miller
1973
7,862.80
Ken Miller Supply, Inc.
1972
39,356.25
1973
71,683.02
*288 The issues are: (1) whether certain payments made by petitioner Ken Miller Supply, Inc., as compensation to its president and sole shareholder, petitioner Kenneth R. Miller, were unreasonable in amount; and (2) whether a substantial amount of the net profits realized by the individual petitioners from interests in certain oil and gas wells was earned income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner Ken Miller Supply, Inc. (hereafter the Corporation), is an Ohio corporation with its principal office in Wooster, Ohio. The Corporation timely filed its Federal corporate income tax returns on the accrual method for 1972 and 1973 with the Internal Revenue Service Center in Cincinnati, Ohio.Petitioners Kenneth R. and Lois N. Miller resided in Shreve, Ohio, when they filed their petitions. They timely filed their joint Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center in Cincinnati, Ohio. Petitioner Ken Miller Supply, Inc., was organized in 1959 by petitioner Kenneth R. Miller. Miller is the Corporation's president and sole shareholder. During the taxable years in issue, members of his family were *289 on the Corporation's board of directors and held various corporate offices. None of them, however, provided any services to the Corporation during those years; their positions were purely nominal. Since first organized, the Corporation has been engaged in the sale and rental of oil and gas drilling equipment and supplies. Operating primarily in Ohio, the corporation's business includes the rental of barrel tanks for fracturing a well (known as "frac" tanks), oil well salvage operations, and related activities. Its primary business, however, is the rental of frac tanks. A frac tank is a large cylindrical tank (30 feet long and 8 feet in diameter) used to store liquids. The liquid, usually water, is used to fracture the ground around a well by means of pressure in order to obtain access to oil and gas deposits. Occasionally, the tanks are used for other purposes, such as water storage for road construction or the storage of fuel or industrial waste. But the Corporation's main source of rentals is oil and gas well operators. During 1972 and 1973, the Corporation owned 258 and 287 frac tanks, respectively. Kept on corporate property, the tanks would be delivered to well *290 sites on short notice. Delivery was usually made on large flatbed-type trucks. Because of muddy conditions, however, delivery sometimes could be accomplished only by using a bulldozer to pull either the truck with the tank on top or the tank itself. In any event, speedy delivery was essential to the success which petitioner enjoyed. As the managing officer of the Corporation, Kenneth was responsible for taking rental orders, keeping track of all frac tanks, and ensuring that they were moved from site to site as quickly as possible. In order to maintain a high turnover of rentals, Kenneth kept close records of the tanks' deliveries and rentals. The records were kept in a small book, which Kenneth carried with him at all times.Those were the Corporation's only records of the number of tanks owned, the lessees, tank locations, and rents due the Corporation. Prior to 1972, Kenneth had developed a variety of techniques and innovations making frac tanks easier to move and safer to work with in the field. Such innovations included skids on the tanks, handrails on ladders, a catwalk on the top of the tanks, and special valves and heaters to permit work in cold weather. Kenneth also *291 designed a special truck to carry the tanks from site to site, a design that has since been copied by the Corporation's competitors. Because of those innovations and the high turnover of tanks, the Corporation's frac tank rental business has been very profitable. Although tank rentals accounted for only 25 percent of gross sales in 1972 and 1973, they were responsible for about 50 percent of net profits. In addition to its frac tank rental business, the Corporation is a full service oil field supply house. During 1972 and 1973, the sale of new and used oil field pipe represented a significant portion of the Corporation's business. Approximately 65 percent of gross sales and 35 percent of net profit was attributable to pipe sales. The Corporation obtains most of its used pipe from old oil wells. The wells are found and purchased for the Corporation by Kenneth. Other corporate employees then plug the well and pull the pipe. They pull the pipes with a used drilling machine redesigned by Kenneth for well salvaging purposes. Although it prefers to use its own employees to salvage old wells, the Corporation also hires independent contractors when the need arises. During *292 1972 and 1973, Kenneth acquired 35 to 40 old wells for the Corporation to salvage. Because of an oil well pipe shortage in those years, the acquisitions were especially lucrative. Kenneth also acquired a substantial amount of used pipe for the Corporation in New Orleans in 1973, which was equally profitable.
In order to sell used pipe, the Corporation must rethread it. In 1972 and 1973, the Corporation owned 4 pipe threading machines, all of which were purchased by Kenneth. The Corporation used two buildings in its pipe threading and a special hoist machine to carry and hold the pipe. Both the buildings and the hoist were conceived and designed by Kenneth. The corporation also sells new oil well pipe. In 1971, Kenneth obtained a franchise for the Corporation to sell Republic Steel Corporation oil field pipe. Republic provides the Corporation with American Petroleum Institute (API) approved pipe. Until he obtained that franchise, the Corporation did not sell any new API approved pipe. The franchise was very profitable in 1972 and 1973, again because of the short supply of oil well pipe. In addition to pipe, the Corporation sells other oil field accessories, including oil well *293 pumping units. In 1972, Kenneth obtained a franchise for the Corporation to sell Churchill pumping units. Notwithstanding the quality of those pumps, Kenneth developed an improved base for them and made other improvements on them. During the years in issue, Miller performed all the managerial or supervisory jobs required for the efficient operation of the corporate business. He was thus responsible for all major corporate decisions, as well as the daily operation of the business. He delegated very little responsibility. Because of this, Kenneth worked long hours, normally 6 days per week, and often worked at home. Nevertheless, he was able to take a one week vacation in 1972 and a ten day vacation in 1973. Part of the 1973 vacation, however, was spent in New Orleans where he acquired more oil field pipes. In 1972, the corporation employed 25 individuals other than Kenneth Miller.Their total compensation was $ 195,883.35. One of those employees was a clerk, and another worked in a retail store on the Corporation's premises. The rest were truck drivers, yardmen, pipe threaders, laborers, and salesmen. In 1973, the corporation employed 23 individuals other than Kenneth *294 Miller. Their total compensation was $ 248,592.05. Except for an additional clerk in 1973, the employees were functionally the same for both years. Also, in order to salvage such a large number of wells, the corporation had to employ independent contractors in addition to its own well salvaging crews in 1972 and 1973. Kenneth was the only employee to be paid a salary in 1972 and 1973; the rest were paid by the hour. His total salary was $ 129,992.20 for 1972 KEN MILLER SUPPLY, INC.
Rate of Return on Investment
[SEE TABLE IN ORIGINAL] (The percentage rate of return on investment is arrived at by dividing Net Income After Tax by Total Investment) and $ 202,139.62 for 1973. For each year, all but $ 24,000 was a bonus equal to 50 percent of corporate profits before taxes. The bonuses and salaries for both years were paid pursuant to appropriate corporate resolutions. The following charts illustrate the history of Kenneth Miller's salary and bonus in relation to the growth of his corporation: KEN MILLER SUPPLY, INC.
[SEE TABLE IN ORIGINAL] During 1972 and u973, Kenneth Miller also operated a sole proprietorship named KenOil Company. KenOil's principal *295 business was the production and sale of oil and gas. Through KenOil, Kenneth thus owned 25 oil and gas wells in 1972 and 1973. He owned a 100 percent interest in the equipment and production of 8 of those wells. He owned the rest jointly with other individuals. For the jointly owned wells, petitioner provided 100 percent of the equipment needed to operate them. He bought the equipment directly from his corporation, Ken Miller Supply, Inc. In exchange, he received a 50 percent interest in the production of each well and retained total ownership of the equipment provided by him. Although he devoted little time to selecting drill sites, he was occasionally consulted by his coowners about site selections. Other than that, petitioner took no part in the development or operation of the jointly owned wells. OPINION The first issue is whether certain payments made by petitioner Ken Miller Supply, Inc., as compensation to its president, petitioner Kenneth Miller, were unreasonable in amount. Petitioner Miller received salaries and bonuses totaling $ 129,992.20 in 1972 and $ 202,139.62 in 1973. Respondent has determined that only $ 48,000 in 1972 and $ 52,800 in 1973 represent *296 reasonable compensation; the rest has been treated as taxable dividends to petitioner Miller, nondeductible by the Corporation. Section 162(a)(1), I.R.C. 1954, [1] allows a deduction for all ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. To be deductible, salaries and bonuses must be both reasonable in amount and in fact payments purely for services. See section 1.162-7(a), Income Tax Regs. This is essentially a question of fact to be determined in light of the facts and circumstances of each case. See, e.g., Pepsi-Cola Bottling Co.of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). In Mayson Mfg. Co. v. Commissioner,178 F.2d 115 (6th Cir. 1949), the Sixth Circuit Court of Appeals discussed several of the factors to be considered: Such factors include the employees's qualifications; *297 the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. [Id. at 119.] Furthermore, salaries and bonuses paid by a closely held corporation to one of its shareholders require especially close scrutiny to prevent the deduction of disguised dividends. E.g. Heil Beauty Supplies v. Commissioner,199 F.2d 193 (8th Cir. 1952), affg. a Memorandum Opinion of this Court. In this regard, we emphasize that the respondent's determination is presumed to be correct and that the burden is on petitioner to prove the reasonableness of his compensation. See Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner Kenneth Miller is the president and sole *298 shareholder of petitioner Ken Miller Supply, Inc. He started the Corporation in 1959 with a total investment of less than $ 3,000. In 1959, its net sales totaled just over $ 80,000. By 1972, net sales were well in excess of $ 1,500,000 and his shareholder's equity exceeded $ 390,000. Most of that success must be attributed to the foresight, determination, and plain hard work of Kenneth Miller. As our findings of fact clearly indicate, Miller was an innovative and hard-working employee. He made numerous improvements in various corporate assets. He practically redesigned the frac tank, the rental of which was a highly profitable business for the Corporation, and made notable improvements on the trucks that delivered those tanks. Miller spent most of his waking hours on corporate business and even devoted some of his vacation time to searching for used oil well pipes, another profitable sales item for the Corporation. The Corporation could not have succeeded without him. Thus we cannot uphold respondent's determination in its entirety. On the other hand, there are a number of factors militating against petitioners. First, the Corporation's high sales and income could not *299 have been realized without a substantial capital investment. Petitioner's equity in the Corporation was $ 390,412.24 in 1972 and $ 494,130.56 in 1973. Yet the dividend paid each year was only $ 750, less than.2 percent of the shareholder's equity. We think this is unreasonably low considering the availability of cash for dividends and the large bonuses paid to Miller. Second, we think that much of the Corporation's growth in the years at issue is attributable to a boom in the oil supply industry. Inflation also contributed in part to the large increase in sales. Third, Miller's salary and bonus in relation to the salaries of all other employees was unusually large. In 1972, Miller received a salary and bonus of $ 129,992.20, while the 25 other employees received a total of only $ 195,883.35 (less than $ 8,000 per employee). In 1973, the figures were $ 202,139.62 for Miller and $ 248,592.05 for the 23 other employees (less than $ 11,000 per employee). Although some discrepancy may be justified because of the Corporation's special need for Miller's services, we do not think such a large one is justified in light of the other factors and circumstances. See also L.E. Pinkham Med. Co. v. Commissioner,128 F.2d 986, 990 (1st Cir. 1942), *300 cert. den. 317 U.S. 675 (1942). Therefore, we find that only $ 100,000 of the salary and bonus paid in 1972 and $ 130,000 of the salary and bonus paid in 1973 were reasonably paid for Miller's services.
Petitioners rely on the fact that under the bonus formula devised to compensate Miller, the Corporation still paid a sizable Federal income tax.This may be true. However, the fact remains that only a nominal dividend was paid each year. Considering the availability of cash to pay such large bonuses, we think that much of the bonuses were merely disguised dividends. At trial, petitioners introduced evidence of compensation paid by COFSCO, Inc., an oil supply company. We are not sure that COFSCO is comparable to petitioner Ken Miller Supply, Inc., in terms of either the products it sells or the volume of its business. Again, the burden of proof is on petitioners. In any event, assuming that the companies are comparable, we do not agree with petitioners' approach to salary comparisons. They compared the total compensation paid by COFSCO to all its managerial employees in 1973 and 1974 with the salaries and bonuses paid to Miller. Although Miller may have performed *301 some of the functions of those employees, he most assuredly did not perform the same services.There were not enough hours in the day for Miller to perform the same services; it would have been virtually impossible for one person to perform effectively all the jobs at COFSCO, the functions of which were performed by Miller at Ken Miller Supply, Inc. Thus we have greatly discounted that comparison. Finally, on this issue, petitioners seek a negative inference from respondent's failure to introduce expert testimony or documentary evidence in support of his position. We cannot overemphasize that it is petitioners' burden, and their burden alone, to prove that the compensation determined by respondent to be unreasonable was in fact reasonable. This is not a situation in which the salary and bonus were paid in an arm's-length agreement between employer and employee. The employee in this case wholly owned and controlled the employer. There was no arm's-length agreement from which the taxpayers might draw a favorable inference. Compare Mayson Mfg. Co. v. Commissioner, supra.
The second issue is whether a substantial amount of the net profits realized by the individual *302 petitioners from interests in certain oil and gas wells was earned income. Petitioners were the owners of various oil and gas wells in 1972 and 1973. They owned 8 of the wells individually and the rest jointly with other individuals. Respondent has determined that only the 8 wholly owned wells may receive earned income treatment under section 1348. Petitioners contend that Kenneth Miller provided substantial services with respect to the jointly owned wells and, therefore, is entitled to earned income treatment for those wells too. The parties agree that capital was a material income producing factor in all the wells, thus subjecting petitioners to the 30 percent limitation of section 911(b). Section 1348 provides for a 50 percent maximum tax rate on personal service taxable income. In order to establish that they had personal service taxable income from the jointly owned oil and gas wells, petitioners must prove that they realized from those wells income which is earned income within the meaning of section 911(b). See section 1348(b)(1). See also Rule 142(a), Tax Court Rules of Practice and Procedure. Section 911(b) provides as follows: (b) Definition of Earned Income. *303 --For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material incomeproducing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. Respondent contends that petitioner Miller provided virtually no services in exchange for his interests in the jointly owned wells. Consequently, respondent concludes that none of the amounts received by petitioners was compensation for services actually rendered. We agree. We think that Miller received his interests in the jointly *304 owned wells solely because he provided the capital (i.e., the equipment) necessary to develop and operate them.Any services that may have been provided when the equipment was delivered to or installed at the well sites were provided by Ken Miller Supply, Inc., from whom petitioner Miller purchased the equipment. We cannot attribute to the taxpayer for purposes of sections 1348 and 911(b) the services provided by someone else, even though those services were paid for by the taxpayer. In substance, petitioner provided no services, only capital. Sections 1348 and 911(b) clearly do not allow earned income treatment for income derived from capital. See also section 1.911-2(c), Income Tax Regs.
Petitioners argue that Miller was personally involved in the selection of well sites and that such activity is sufficient for this Court to find earned income from those wells. We have found, however, that Miller spent very little time in the site selection process. He relied heavily on his coowners to decide where the wells should be drilled. We think that Miller's activities in this regard were no more than any reasonably preudent investor would do when selecting an investment for himself. *305 Petitioner admitted as much at trial when he testified that he rarely questioned the selection of sites made by his coowners. Therefore, we uphold respondent's determination of this issue. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩